UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF J & N SEEDING, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>MORRIS INC., UNITED FIRE & CASUALTY COMPANY,<br><br>Defendants. | 3:22-CV-03009-RAL<br><br><br>OPINION AND ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Defendant Morris Inc. hired Plaintiff J & N Seeding LLC to work on a federal construction project in the Badlands National Park. A dispute over how much Morris owed J & N for its work led to J & N suing Morris and its Miller Act surety, Defendant United Fire & Casualty Company, and Morris counterclaiming. Morris now moves for summary judgment on J & N's claims and on the counterclaim. This Court grants Morris summary judgment on the issue of the value of the subcontract between Morris and J & N, but otherwise denies the motion.

**I.  Facts**

In February 2020, Morris received an award of a contract (the General Contract) with the Federal Highway Administration (FHWA) to complete the Dillon Pass Embankment Repair Project (the Project) in the Badlands National Park. Doc. 25 ¶¶ 1–2; Doc. 30 at ¶¶ 1–2; Doc. 27-1. As required under the Miller Act, Morris obtained a payment bond for the Project from United

1

Fire.[1]  Doc. 25 ¶ 3; Doc. 30 ¶ 3.  Morris then began soliciting seeding and erosion control quotes from potential subcontractors, including J & N.  Doc. 25 ¶ 4; Doc. 30 ¶ 4.  In early March 2020, Morris provided J & N with the General Contract's specifications for J & N's portion of the Project and the Special Conditions of Contract.  Doc. 25 ¶ 5; Doc. 30 ¶ 5.

Morris and J & N signed a Subcontract in mid-March 2020 for J & N to perform the seeding and erosion control portion of the General Contract.  Doc. 25 ¶ 6; Doc. 30 ¶ 6; Doc. 27-3.  The Subcontract required J & N to "furnish, in accordance with the terms and conditions of the General contract, all supervision, labor, tools, equipment, materials, and supplies" necessary for its part of the Project.  Doc. 27-3 at 1; Doc. 25 ¶ 7; Doc. 30 ¶ 7.  The General Contract set the contract completion date as November 15, 2020, and stated that the seeding work needed to be performed "between October 15th and December 15th."[2]  Doc. 27-1 at 60, 92; Doc. 25 ¶¶ 8–9; Doc. 30 ¶¶ 8–9; Doc. 26-5 at 4; Doc. 32 at 3.  The record contains conflicting testimony on how to square the October 15 to December 15 seeding period with the November 15, 2020 completion date.  John Morris, Morris's president, believed that the November 15, 2020 completion date applied to everything but the seeding, which did not have to be finished until December 15.  Doc. 26-2 at 2, 15.  Erin Severyn, a project manager for Morris, testified that the seeding needed to be done by November 15, 2020.  Doc. 26-6 at 3.  Ian Johnson, a civil engineer for the FHWA assigned to the

---

[1] The Miller Act requires a government contractor like Morris to obtain a payment bond to protect "all persons supplying labor and material in carrying out the work provided for in the contract." 40 U.S.C. § 3131(b)(2).  "Because subcontractors may not impose a lien on government-owned property, the Miller Act ensures that they can recover for materials and labor contributed to public projects." Consol. Elec. & Mechs., Inc. v. Biggs Gen. Contracting, Inc., 167 F.3d 432, 434 (8th Cir. 1999).

[2] The Subcontract mistakenly said that J & N had to complete its work by December 30, 2017, which is over two years before the parties even entered the Subcontract.  Doc. 27-3 at 1–2.

2

Project, likewise testified that the seeding needed to be finished by the November 15 completion date.³ Doc. 26-1 at 14.

J & N did some erosion control work for the Project in 2020 but could not begin seeding until Morris had prepared the ground. Doc. 30 ¶ 10; Doc. 26-4 at 5, 9; Doc. 26-2 at 12; Doc. 26-6 at 4. John Morris testified that the Project was not ready for seeding in 2020 because of COVID delays and changes in the way the FHWA wanted some work done. Doc. 26-2 at 12. COVID delays and additional work led Morris and the FHWA to extend the contract completion date to November 15, 2021. Doc. 27-4 at 1; Doc. 25 ¶ 8; Doc. 30 ¶ 8. J & N notified Morris in early October 2021 that it could not start seeding until November 1 and that it would only have four employees on the Project. Doc. 25 ¶ 10; Doc. 30 ¶ 10. John Noltner testified that J & N would have begun seeding in 2020 if Morris had prepared the ground for them to do so. Doc. 26-4 at 5, 7, 9; Doc. 30 ¶ 10.

John Morris emailed J & N on October 14, 2021, expressing concern that the proposed November 1 start date would not allow J & N to complete the seeding on time. Doc. 25 ¶ 11; Doc. 30 ¶ 11; Doc. 27-5. The General Contract imposed liquidated damages for belated work, so finishing the Project before the completion date was important to both parties. Doc. 27-1 at 25; Doc. 26-3 at 6–7. John Morris's October 14, 2021 email offered to help J & N complete the work but explained that Morris "would just need to be able to recoup our costs to provide this assistance." Doc. 27-5 at 1. John Morris then met with John Noltner, and Morris and J & N agreed that Morris would help J & N complete the Project in exchange for Morris's "costs." Doc. 25

---

³J & N claims that its owners, John and Laurie Noltner, both believed that they had two years to finish the seeding. Doc. 32 at 3. The portions of the Noltners' testimony J & N cites on this issue do not identify any basis for believing that J & N had two years to complete the seeding, however. See Doc. 26-4 at 16; Doc. 26-5 at 2.

¶¶ 12–13; Doc. 30 ¶¶ 12–13; Doc. 26-4 at 13–14; Doc. 26-2 at 4–5; Doc. 38 at 22. The parties did not reduce this agreement to writing, however, and J & N claims that the parties never agreed on what Morris could recoup as "costs." Doc. 30 ¶ 13.

J & N started seeding and erosion work on November 1, 2021, with assistance from two Morris employees. Doc. 25 ¶ 14; Doc. 30 ¶ 14; Doc. 26-2 at 4. Once it became clear that J & N was progressing too slowly to finish by November 15, however, Morris hired more employees from a day labor service and supplied additional materials and equipment. Doc. 25 ¶¶ 14–15; Doc. 30 ¶¶ 14–15; Doc. 26-3 at 6; Doc. 26-5 at 11. Morris claims to have incurred $114,017 in costs to help J & N finish its work under the Subcontract. Doc. 25 ¶¶ 16–17; Doc. 30 ¶¶ 16–17; Doc. 26-7 at 6.

Two disputes arose after the Project was completed, the first being the value of the Subcontract. Doc. 25 ¶ 24; Doc. 30 ¶ 24. The General Contract required Morris to measure the work performed for the Project and submit these measurements to the FHWA for approval and payment. Doc. 27-1 at 61–63; see also U.S. Dep't of Transp., Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects (FP-14) Section 109 (2014).[4] The Subcontract, in turn, required Morris to "pay [J & N], promptly upon receipt thereof from the [Federal Government], the amount received by [Morris] on account of [J & N's] work to the extent of [J & N's] interest therein." Doc. 27-3 at 8. Morris employees used a GPS rover and measuring wheel to quantify the work J & N was to have done on the Project and then submitted these measurements to the FHWA for review and payment. Doc. 26-6 at 2–3; Doc. 26-3 at 3, 5; Doc.

---

[4]The General Contract incorporates and adds special contract requirements to the FP-14. Doc. 27-1 at 46 ("The following Special Contract Requirements amend and supplement the [FP-14] . . . ."); id. at 1 ("This contract cites Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, FP-14.").

4

25 ¶ 19; Doc. 30 ¶ 19. The FHWA approved the measurements and paid Morris accordingly. Doc. 25 ¶¶ 19, 21–22; Doc. 30 ¶¶ 19, 21–22; Doc. 33-1. Based on the measurements and quantities paid by the FHWA, Morris ultimately calculated the value of the Subcontract as $296,422.94.[5] Doc. 25 ¶¶ 19, 21–22; Doc. 30 ¶¶ 19, 21–22; Doc. 33-1. Morris initially paid J & N $166,468.69 for its portion of work under the Subcontract but then determined during discovery that it still owed J & N for a fertilizer called biotic soil amendment (BSA) not installed and for hauling the BSA. Doc. 25 ¶¶ 23, 25; Doc. 30 ¶¶ 23, 25. Morris has now paid J & N for these items, bringing the total amount it paid J & N to $185,911.69. Doc. 25 ¶ 25; Doc. 30 ¶ 25. Morris contended that this $185,911.69 payment led to a $3,505.75 overpayment to J & N since the total value of the Subcontract was $296,422.94 but Morris spent $114,017 helping J & N complete the Subcontract.

J & N disagreed with Morris's calculations, valuing the Subcontract at $319,033.40 and claiming that it is entitled to this entire amount. Doc. 25 ¶ 26; Doc. 30 ¶ 26. J & N's $319,033.40 valuation of the Subcontract was based on measurements and quantities greater than those Morris submitted to the FHWA and was paid for. Doc. 25 ¶ 26; Doc. 30 ¶ 26; Doc. 27-8. At least some of J & N's calculations underlying its valuation of the Subcontract were based off the amount of material J & N bought and installed rather than physical measurements in the field. Doc. 26-4 at 13–15; Doc. 26-5 at 6–8; Doc. 32 at 6–7; Doc. 38 at 17. J & N also claimed that Morris owes it $1,775 more for BSA not installed. Doc. 26-5 at 7; Doc. 27-8; Doc. 32 at 8.

The second dispute is how much Morris is owed for helping J & N complete the Subcontract. Again, Morris claimed that it incurred $114,017 in costs working on the Subcontract. J & N agreed that Morris is entitled to some offset for helping complete the Subcontract, but argued

---

[5]Morris initially calculated the value of the Subcontract as $276,979.94 but later increased the value to $296,422.94. Doc. 25 ¶ 22; Doc. 30 ¶ 22.

that there was no definitive agreement on what constituted "costs" and that Morris's costs were much lower than $114,017. Doc. 30 ¶¶ 13, 29; Doc. 32 at 8–12; Doc. 38 at 22–23. J & N now claims that Morris's failure to prepare the ground for seeding earlier was a major cause of J & N's inability to complete the Subcontract without assistance, and that the jury should be able to consider this when deciding how much Morris is owed for its work. Doc. 32 at 10–11.

J & N sued Morris and United Fire, invoking federal jurisdiction under the Miller Act and supplemental jurisdiction. Doc. 1. Count 1 of J & N's complaint asserts a Miller Act claim that United Fire owes J & N $152,564.68 for unpaid labor and materials. Doc. 1 ¶¶ 21–22. Count 2 alleges that Morris breached the Subcontract by failing to fully compensate J & N for its work on the Project and by failing to allow J & N sufficient time to complete its work. Id. ¶¶ 24–26. Morris's counterclaim against J & N alleges that J & N breached the Subcontract by failing to provide an adequate workforce (Counterclaim 1), that J & N was unjustly enriched by the work Morris performed under the Subcontract (Counterclaim 2), and that Morris is entitled to recover for the work it performed under a quantum meruit theory (Counterclaim 3). Doc. 9 ¶¶ 7–18. Morris seeks $3,505.75 under its counterclaim, the amount Morris says it overpaid J & N under the Subcontract. Morris now moves for summary judgment on its counterclaim as well as on J & N's claims. Doc. 23.

## II. Standard of Review

Summary judgment is proper under the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Main v. Ozark Health, Inc., 959 F.3d 319, 323 (8th Cir. 2020). The moving party has the initial burden to show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012).

A party opposing a properly supported motion for summary judgment cannot rely on "[m]ere allegations [that are] unsupported by specific facts or evidence beyond the non-moving party's own conclusions." Eggers v. Wells Fargo Bank, N.A., 899 F.3d 629, 632–33 (8th Cir. 2018). Courts ruling on a summary judgment motion view the facts and inferences fairly drawn from the facts in the nonmoving party's favor, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986); see also Baker v. Silver Oak Senior Living Mgmt. Co., L.C., 581 F.3d 684, 687 (8th Cir. 2009), but do not "resort to speculation," Baker, 581 F.3d at 687.

## III. Analysis

### A. Jurisdiction

The Miller Act requires general contractors to obtain a payment bond for federal construction projects, 40 U.S.C. § 3131(b)(2), and allows subcontractors to sue on these bonds in federal court, id. § 3133(b)(1), Consol. Elec. & Mechs., Inc. v. Biggs Gen. Contracting, Inc., 167 F.3d 432, 435 (8th Cir. 1999) ("Claims brought under the Miller Act . . . are federal causes of action . . . ."); United States ex rel. Olson v. W.H. Cates Const. Co., 972 F.2d 987, 989–90 (8th Cir. 1992) (explaining that unpaid subcontractors on a federal project "shall have the right to sue on such payment bond in federal district court" (cleaned up and citation omitted)). This Court has federal question jurisdiction over J & N's Miller Act claim because J & N seeks to recover under United Fire's payment bond for unpaid labor and materials. Supplemental jurisdiction exists over

J & N's contract claim and Morris's counterclaim because they arise from the same facts as the Miller Act claim. 28 U.S.C. § 1367(a) (stating that courts have supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"); Tullos v. Parks, 915 F.2d 1192, 1194–95 (8th Cir. 1990) (explaining that district courts have jurisdiction over compulsory counterclaims in a federal question case).

### B. Miller Act and Breach of Contract Claims

Federal law governs J & N's claim under the Miller Act, while state law governs the parties' breach of contract claims. Consol. Elec. & Mechs., Inc., 167 F.3d at 435; see also Barton v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011) ("A federal court . . . exercising supplemental jurisdiction over a state law claim must apply state substantive law."). J & N's federal and state claims are closely related because "a surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract." Consol. Elec. & Mechs., Inc., 167 F.3d at 435. South Dakota law applies to the breach of contract claims, as both contracts were made in South Dakota, involve South Dakota companies, and contemplated work performed in South Dakota. See SDCL § 53-1-4 ("A contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.").

The elements of a breach of contract claim under South Dakota law are "(1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages." Bowes Constr., Inc. v. S.D. Dep't of Transp., 793 N.W.2d 36, 43 (S.D. 2010). Whether a party breached a contract is generally a question of fact. Weitzel v. Sioux Valley Heart Partners, 714 N.W.2d 884, 894 (S.D. 2006). Contract interpretation, though, is a question of law, with courts seeking to "ascertain and give

8

effect to the intentions of the parties." Pesicka v. Pesicka, 618 N.W.2d 725, 726–27 (S.D. 2000) (citation omitted). "If that intention is clearly manifested by the language of the agreement, it is the duty of this Court to declare and enforce it." Pauley v. Simonson, 720 N.W.2d 665, 668 (S.D. 2006) (cleaned up and citation omitted). If the contract is ambiguous, however, "evidence must be introduced to determine what the intentions of the parties were and such evidence creates a question of fact, which must be resolved by the jury." Gail M. Benson Living Trust v. Physicians Off. Bldg., Inc., 800 N.W.2d 349, 344 (S.D. 2011) (cleaned up and citation omitted). A contract is ambiguous "when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Id. at 343 (citation omitted). Although the Miller Act claim and the parties' breach of contract claims are separate, they can be addressed together as they all involve the value of the Subcontract and the "costs" Morris incurred in completing J & N's portion of the Subcontract.[6]

### C. Value of Subcontract

As stated above, J & N values the Subcontract at $319,033.40 while Morris values it at $296,422.94. This divergence in value comes from different measurements the parties have for five items[7] under the Subcontract: (1) soil tackifier; (2) fiber roll (wattle); (3) BSA; (4) seeding; and (5) rolled erosion control product (blanket). Doc. 27-8; Doc. 24 at 9; Doc. 32 at 5. The

---

[6]Morris also has claims for quantum meruit and unjust enrichment, but those remedies are unavailable unless Morris lacks an adequate remedy at law. Johnson v. Larson, 779 N.W.2d 412, 416 (S.D. 2010) ("[T]he equitable remedy of unjust enrichment is unwarranted when the rights of the parties are controlled by an express contract."); Mealy v. Prins, 934 N.W.2d 891, 903 (S.D. 2019) ("Absent fraud, bad faith, or similar theories, unjust enrichment claims are generally unavailable when a claimant has a full, adequate, and complete remedy available at law." (cleaned up and citation omitted)).

[7]Although the parties also had different measurements for other items, these items do not appear to be at issue as they involved instances where Morris had higher measurements than J & N and thus paid J & N more than J & N requested. Doc. 27-8.

Subcontract assigned a unit of measurement to these items—say, for instance, an acre or linear foot—and an accompanying price for that unit of measurement.[8] Doc. 27-3 at 1, 10–13; Doc. 26-5 at 5–6. The General Contract, in turn, instructs on how to determine a particular unit of measurement. FP-14, Sections 109, 624–25, 629.08; Doc. 27-1 at 61–63, 93.[9] For example, the General Contract directs the contractor to measure on "the ground surface" when measuring turf establishment (which includes seeding) by the acre or square yard. Doc. 27-1 at 92–93.

Consistent with the General Contract, Morris employees physically measured J & N's work with a GPS rover and measuring wheel. Doc. 26-1 at 17–18; Doc. 26-6 at 2; Doc. 26-3 at 3–5; Doc. 25 ¶ 19; Doc. 30 ¶ 19. Morris had no incentive to undermeasure J & N's work, as the more money J & N made, the more money Morris would make. Doc. 26-5 at 8; Doc. 38 at 17. J & N, though, measured its work differently than Morris. John Noltner testified that J & N used the amount of material delivered to the Project to calculate its measurements. Doc. 26-4 at 13–15; Doc. 32 at 6. Laurie Noltner likewise testified that at least some of J & N measurements were based off the amount of material J & N bought and installed rather than physical measurements J & N performed. Doc. 26-5 at 6–8.

J & N has failed to show a genuine dispute of material fact on the value of the Subcontract. J & N's own measurements do not create a material dispute of fact because they were based on the

---

[8]The Subcontract and Laurie Noltner's testimony indicate that the unit prices J & N was supposed to be paid are set forth in its bid, which is incorporated into the Subcontract. Doc. 27-3 at 1, 10–13; Doc. 26-5 at 5–6.
[9]Section 109 of the General Contract is entitled "Measurement and Payment." Doc. 27-1 at 61; FP-14 at Section 109. J & N, in its brief but not at the hearing, argued that Section 109 "discusses measurement and payment but does not set forth how the measuring was to be done." Doc. 32 at 6. J & N is correct that the version of Section 109 in the General Contract filed in the record does not discuss how to perform the measurements. See Doc. 27-1 at 61–63. The FP-14, however, which the Subcontract incorporates and adds special conditions to, does set forth how the parties were to measure a unit of measurement. FP-14, Sections 109, 624–25, 629.08; Doc. 27-1 at 61–63, 93.

materials purchased and installed rather than the measurements called for in the Subcontract and General Contract. Indeed, J & N admitted at the March 2024 motion hearing that its method of measurement differed from how the contracts said J & N's work should be measured. Doc. 38 at 17–19. J & N has offered no physical measurements differing from those taken by Morris, id. at 18, and nothing suggests that the FHWA would have accepted J & N's methodology to calculate the contract amount. Johnson, the FHWA engineer assigned to the Project, testified that the items in the Subcontract required measurements in the field. Doc. 26-1 at 17. Johnson also agreed that measurements based on the quantity of material purchased would be inconsistent with how the FHWA paid for work under the General Contract. Id. What this Court is left with, then, is J & N's belief that Morris somehow undermeasured J & N's work. No reasonable jury could find in J & N's favor on this record, and Morris is entitled to summary judgment that the value of the Subcontract is $296,422.94.[10] See Reed v. City of St. Charles, 561 F.3d 788, 790–91 (8th Cir. 2009) (explaining that to survive summary judgment, a "plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor, without resort to speculation, conjecture, or fantasy" (cleaned up and citations omitted)).

    **D.**    **Morris's Costs**

There is no dispute that Morris and J & N orally agreed Morris would help J & N complete the Project in exchange for Morris recouping from the contract amount its "costs." Doc. 25 ¶ 13;

---

[10] J & N argues in its brief that the Subcontract does not "state that the subcontractor cannot recover amounts above what was paid by FHWA to Morris." Doc. 32 at 7. J & N also points out that Morris actually paid J & N for two items for which Morris never received reimbursement from FHWA. Miller Act and breach of contract claims, however, are based on the terms of the contract and here the Subcontract states that Morris is "to pay the Subcontractor, promptly upon receipt thereof from the Owner, the amount received by the Contractor on account of the Subcontractor's work to the extent of the Subcontractor's interest therein." Doc. 27-3 at 8.

11

Doc. 30 ¶ 13; Doc. 26-4 at 13–14; Doc. 38 at 22. The question here is what the parties meant by "costs" and the amount of those costs. Morris claims that John and Laurie Noltners' own testimony and an expert report from Certified Public Accountant Nina Braun show that the amount of its costs is undisputed. Braun's report states that Morris incurred $114,017 in costs to complete J & N's work under the Subcontract. Doc. 26-7 at 6. This amount included both direct costs like materials, labor, subcontractor charges, and performance bonds as well as indirect costs like rent, facility costs, payroll taxes, health insurance, and supervision costs. Doc. 26-7 at 4. J & N does not dispute that the costs Morris incurred when completing J & N's part of the Project are those typically incurred in construction contracts.[11] Doc. 25 ¶ 29; Doc. 30 ¶ 29. After all, Laurie Noltner testified that employers must pay for things like unemployment insurance, worker's compensation, and other benefits, and that J & N includes these costs when it bids on jobs. Doc. 26-5 at 11. She also agreed that motels, meals, and fuel are project-related expenses. Doc. 26-5 at 11. John Noltner too agreed that Morris should be compensated for materials it supplied, lodging for its workers, fuel, and drive time. Doc. 26-4 at 14.

J & N, though, contends that Morris's claim to costs amounting to $114,017 presents a jury question. Among other things, J & N argues that the poor quality of the workers Morris provided creates a material dispute of fact on how much Morris is owed. Lorie Noltner testified that the day laborers Morris hired to complete J & N's portion of the Project would "stand around" and "not work" and that Morris had different workers showing up each day. Doc. 26-5 at 11. John Morris

---

[11] J & N's only response to Morris's statement of undisputed fact on this point is that "there was no definitive agreement as to how much Plaintiff was to compensate Morris." Doc. 30 ¶ 29. That is not enough to create a genuine dispute on whether the costs Morris incurred when completing J & N's part of the Project are those typically incurred in construction contracts. See Danielson v. Huether, 18-CV-04039, 2021 WL 217706, at *7 (D.S.D. Jan. 21, 2021) (considering a fact undisputed when the nonmoving party failed to cite to the record to support his objection to the fact and the fact was otherwise established in the record).

acknowledged Lorie Noltner's complaint at least in part, testifying that Morris had "one or two employees" working on J & N's portion of the Project who "weren't cutting it" and had to be let go. Doc. 26-2 at 6.[12] J & N also claims that Morris seeks to recover for hammers and utility knives Morris bought for the Project even though Morris retained these items. J & N believes that Morris did not give it any credit for the value of these items when calculating Morris's costs.

J & N's argument about the incompetence of Morris's workers and the materials Morris bought necessarily raises the question of what the term "costs" means. Morris argues that J & N's complaints about incompetence and materials amount to J & N imposing additional terms on the word "costs." In Morris's view, the oral agreement requires J & N to pay all Morris's "costs" in assisting J & N complete its work, without qualification. But that is not how J & N understood

---

[12]Citing to a March 2022 email from Morris Secretary Mark Morris, J & N claims that it offered to pay Morris $56,484.14 for its work on the Project but that Morris "rejected this proposal and sought $90,000." Doc. 32 at 9. J & N also cites to a pay request Morris sent J & N at some point that includes a $90,000 deduction for "Morris Labor." Doc. 33-1; Doc. 32 at 5. This Court did not consider the $90,000 figure when ruling on Morris's motion for summary judgment. As Morris points out, Rule 408 of the Federal Rules of Evidence excludes evidence of compromise when offered to "prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408. J & N's brief acknowledges that the $90,000 referenced in the email was a settlement offer, Doc. 32 at 9, and the email and Mark Morris's testimony show that the $90,000 was evidence of an attempted compromise under Rule 408. The email explained that Morris arrived at the $90,000 figure by discounting the number of labor hours it expended on J & N's portion of the Project, using a lower hourly rate for its employees than normal, and excluding lodging costs. Doc. 33-4; Doc. 26-3 at 5, 7; see also Doc. 26-2 at 5. Mark Morris testified that the email sought to avoid litigation. Doc. 26-3 at 7. The email also shows that the amount of Morris's costs was disputed when Mark Morris sent it; the email explains that an invoice J & N sent crediting Morris $15,812.50 for its work on the Project did not come close to covering its costs, but that Morris would accept $90,000. Doc. 33-4; see Weems v. Tyson Foods, Inc., 665 F.3d 958, 965 (8th Cir. 2011) ("A dispute exists for Rule 408 purposes so long as there is an actual dispute or difference of opinion regarding a party's liability for or the amount of the claim." (cleaned up and citation omitted)). J & N has not explained how the $90,000 figure would be admissible to show the amount of Morris's costs. See Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012) (explaining that when a party objects that an item cannot be presented in an admissible form, "the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated").

the oral agreement. Lorrie Noltner testified that she believed J & N's obligation to pay Morris's costs would be limited to "what is actually reasonable."[13] Doc. 26-5 at 11. And she viewed much of Morris's labor costs as unreasonable because of the incompetence of some of Morris's workers. Id.

A reasonably intelligent person viewing the oral agreement objectively could find that it is capable of more than one meaning. See Gail M. Benson Living Trust, 800 N.W.2d at 343. It is plausible, as Morris contends, that the oral agreement required J & N to reimburse Morris for its costs, whatever those might be. But it is also plausible that the oral agreement contemplated at least some limit of reasonableness on what costs Morris could recover. Indeed, interpreting the term "costs" as lacking qualification would mean that J & N would have no recourse no matter how exorbitantly Morris spent on things like lodging, materials, and the number and compensation of day laborers. Because both interpretations of the oral agreement are reasonable, the agreement is ambiguous to that limited extent, necessitating evidence of the parties' intent when entering it. See id. at 344 ("[W]hen there is an ambiguous contract, evidence must be introduced to determine what the intentions of the parties were and such evidence creates a question of fact, which must be resolved by the jury." (cleaned up and citation omitted)). The interpretation of the oral agreement creates a genuine dispute of material fact affecting the amount of "costs" to which Morris is entitled, which makes summary judgment inappropriate. Id.

---

[13]Morris argues that Laurie Noltner "acknowledged that J & N had no veto power" over Morris's costs in the following deposition testimony:
> **Morris's Counsel**: There's nothing in [the October 14, 2021 email from John Morris] that gives you veto power to decide which of his costs are reasonable. The deal was he would do it for his cost, and you agreed to that.
> **Laurie Noltner**: Yes.

Doc. 26-5 at 11. This Court does not read Laurie Noltner's testimony as agreeing that the term "costs" was unqualified, particularly when she had just testified that she believed that Morris's costs would be limited to what was reasonable.

14

### E. BSA Not Installed

The BSA not installed was one of the items Morris determined during discovery for which it should pay J & N. Doc. 25 ¶ 25; Doc. 30 ¶¶ 24–25. Mark Morris testified that Morris managed to get $15,975 from the FHWA for the BSA not installed, and the parties agree that Morris paid J & N this same amount. Doc. 26-3 at 2, 4; Doc. 30 at ¶ 24. J & N now claims that it spent $17,750 on the BSA not installed and that Morris thus owes it an additional $1,775. Doc. 26-5 at 7; Doc. 27-8; Doc. 32 at 8. J & N argues that it is entitled to this additional amount because "[i]f Morris agreed to pay J & N for the BSA not installed, Morris should have paid J & N for the amount J & N paid to purchase the product, instead of simply relying upon the amount Morris received from FHWA." Doc. 32 at 8. Morris did not address the BSA not installed in its opening brief and only summarily mentioned it in the reply brief, asserting that any dispute about the BSA not installed is immaterial because the General Contract and Subcontract only required it to pay J & N what it had received from the FHWA. Doc. 34 at 7. At the hearing, Morris explained that the BSA not installed was not a contract item and that it was essentially paying J & N for "extra work" for the BSA not installed. Doc. 38 at 7. Morris also argued that even if the amount owed for the BSA not installed is disputed, Morris is still owed more ($3,505.75) under its counterclaim. Id. at 7–8.

Viewing the facts in the nonmovant J & N's favor, summary judgment on the BSA not installed must be denied. J & N seems to suggest that it had a sort of extra-contractual agreement for Morris to pay J & N for the BSA not installed. Either this Court or the jury will need to hear more from the parties about what that agreement was and how they arrived at different amounts on the BSA not installed.

### IV. Conclusion

For the reasons stated above, it is

15

ORDERED that Morris's Motion for Summary Judgment, Doc. 23, is granted on the issue of the value of the Subcontract being $296,422.94 but is otherwise denied.

DATED this 4th day of September, 2024.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE